UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW LIFE SOUTH COAST CHURCH,<br><br>Plaintiff,<br>v.<br><br>CHARLIE BAKER, Governor of the Commonwealth of Massachusetts, in his official and personal capacities; MICHAEL FLANAGAN, Director of the Massachusetts Department of Labor Standards, in his official and personal capacities; the CITY OF NEW BEDFORD; JONATHAN F. MITCHELL, Mayor of the City of New Bedford, in his official and personal capacities; DAMON CHAPLIN, Director of the City of New Bedford Health Department, in his official and personal capacities,<br><br>Defendants. | Case No.: 1:21-cv-10765<br><br>**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND LEGAL RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff New Life South Coast Church ("New Life" or "the Church"), by and through counsel, brings this action to stop Governor Charlie Baker and other officials of the Commonwealth of Massachusetts and the City of New Bedford (collectively, "Defendants") from violating its rights under the First Amendment to the United States Constitution, alleging:

**NATURE OF THE ACTION**

1. This case concerns Massachusetts' discriminatory and unlawful COVID-19-related restrictions on places of worship. With COVID-19 cases falling and vaccines more widely available, Massachusetts has decided to lift many COVID-19-related restrictions. Unfortunately, Massachusetts continues to impose onerous restrictions on places of worship even as it loosens restrictions on comparable commercial and leisure activities. Massachusetts' decision to favor

business and leisure over religious exercise is a blatant violation of the First Amendment, and it is causing severe harm to New Life.

2. In particular, Massachusetts' phased COVID-19 reopening regulations, both as drafted by the Commonwealth and as implemented by the City, single out places of worship for differential and disfavored treatment.  Under those regulations, restaurants, theaters, public transit, and other places of public gathering have limited or no restrictions on capacity, beyond the practical constraints of social distancing, while places of worship must follow more burdensome capacity restrictions.  In addition, the regulations single out places of worship for special disfavor by barring "communal gatherings" before and after the religious service—a restriction that applies to no other institution or activity, and that purports to regulate *how* Massachusetts citizens may exercise religion.

3. Massachusetts' regulations on places of worship are unlawful.  The Supreme Court's recent opinion in *Tandon v. Newsom* makes clear that, where less onerous COVID-19-related regulations suffice for comparable secular activities, those same regulations suffice for religious activities.  Massachusetts' regulations fail this standard.  The regulations make it easier to meet at Applebee's or an AMC theater than at New Life.  This cannot stand.

4. The leadership and congregants of New Life wish to gather together to worship God, encourage each other in their faith, and share that faith with others.  Massachusetts' unlawful targeting of religious practice has significantly curtailed and continues to curtail New Life's ability to take those actions.  New Life comes to this Court for relief.

## JURISDICTION AND VENUE

5. This civil rights action raises federal questions under the United States Constitution, particularly the First Amendment, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

6. The Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

7. This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201–02; the requested injunctive relief pursuant to 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

8. Venue lies in this district because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.  28 U.S.C. § 1391(b)(2).

## PLAINTIFF

9. Plaintiff is New Life South Coast Church.  The Church is a Christian house of worship with its principal campus located in New Bedford, Massachusetts, and another campus located in Fall River, Massachusetts.

## DEFENDANTS

10. Defendant Charlie Baker is the Governor of the Commonwealth of Massachusetts and is sued in his official and personal capacities.  Defendant Baker issued, otherwise directed Defendant Flanagan to issue, and approved Defendant Flanagan's issuance of, the Commonwealth-wide policies and practices challenged herein.

11. Defendant Michael Flanagan is the Director of the Massachusetts Department of Labor Standards and is sued in his official and personal capacities.  Defendant Flanagan issued, subject to the Governor's approval, the Commonwealth-wide policies and practices challenged herein.

12. Defendant City of New Bedford is a municipality located in the Commonwealth of Massachusetts.

13. Defendant Jonathan F. Mitchell is Mayor of the City of New Bedford and is sued in his official and personal capacities. As mayor, Defendant Mitchell oversees the City of New Bedford Health Department.

14. Defendant Damon Chaplin is Director of the City of New Bedford Health Department and is sued in his official and personal capacities. As Director of the City of New Bedford Health Department, Defendant Chaplin enforces the Commonwealth-wide policies and practices challenged herein.

15. The municipal policies and practices challenged herein are those of the City of New Bedford.

## FACTUAL BACKGROUND

### I. New Life Responds to the COVID-19 Pandemic

16. New Life is a thriving, non-denominational Christian church in the charismatic tradition with its principal campus in New Bedford, Massachusetts. Before the pandemic, approximately 1,300 worshippers attended the Church's two Sunday services.

17. New Life desires to be a blessing and not a burden to its community, and it has proactively responded to community needs that stemmed from or arose during the COVID-19 pandemic with charitable gifts and assistance valued at over $122,000. For example, between both its campuses, since the start of the COVID-19 pandemic: New Life's food pantry has fed over 31,000 people and distributed over $3,000 in Christmas toys to local children; New Life has provided over $30,000 in mortgage, rent, and utilities assistance to local families; New Life has given almost $30,000 in gift cards for groceries to local families; New Life has provided almost $23,000 in financial assistance to meet various daily needs of local families; New Life has purchased over $2,000 in meals for the families of hospital workers; New Life has paid over $8,000

in funeral expenses for local families that have lost loved ones; and New Life has provided over $3,000 in financial assistance to fire victims. New Life wants to continue to meet the needs—both physical and spiritual—of the local community, and to do so without any hindrances that are unnecessary to protect the community's health and safety.

18.     When the pandemic struck, New Life acted swiftly to protect both its members and the New Bedford community. The Church has worked cooperatively with the City of New Bedford to implement applicable guidelines, and in consultation with the City's health inspector, the Church has adopted an array of best practices. The Church asks all attendees to wear masks, has signs regarding mask-wearing posted at the entrance to the Church, has masks available for those who forget to bring one, and provides hand sanitizer throughout the Church. The Church has removed chairs from the sanctuary to create at least six feet of separation between attendees and seats together only members of an immediate household. The entire church building is cleaned between services. The Church has added an overflow in the lobby and added a third service on Saturday to operate at reduced capacity, and children's classrooms are sanitized and operating at reduced capacity.

19.     During the summer of 2020, New Life went so far as to invite New Bedford Health Director Damon Chaplin to review all of the Church's COVID-19 preparation and response procedures. In ensuing health inspections, New Bedford officials found that the Church exceeded their expectations for COVID-19 preparedness and safety, with some stating that the Church's preparations were "above and beyond" what was expected.

20.     New Life's sanitation and social distancing measures have been effective. New Life has never suffered a COVID-19 outbreak and, indeed, the Church is not aware of *any* cases of virus transmission attributable to worship at the Church. And New Life remains committed to

observing social distancing, face covering, and sanitation requirements necessary to protect its congregants' health and the health of the wider New Bedford community.

## II.    Massachusetts Favors Business and Leisure over Religious Exercise

21.    On March 18, 2021, Governor Charlie Baker issued COVID-19 Order 66 ("Order 66"),[1] which advanced the Commonwealth to Phase IV, Step 1 of COVID-19 reopening protocols effective March 22, 2021.  Like previously issued orders, Order 66 provides that certain enterprises "may open [their] premises to workers . . . and the public" so long as they follow the Director of Labor Standards' "sector-specific COVID-19 workplace safety rules" (the "DLS Standards").

22.    Along with other "sectors," the DLS Standards include a set of restrictions applicable to "places of worship," which are defined to include "all Places of Worship and Religious Services, and all services and activities including regular and holiday services, weddings, funerals, wakes, support group meetings, and other related gatherings."[2]  The DLS Standards applicable to places of worship impose detailed capacity restrictions, social distancing requirements, face covering requirements, restrictions on communal gathering and the provision of food and drink, cleaning and disinfecting and hygiene protocols, and various other requirements.

### *Capacity Limitations*

23.    The DLS Standards for places of worship impose the following capacity limitations:

Occupancy Limitations

- For indoor services, places of worship must monitor member entries and exits and limit occupancy at all times to the greater of the following:

---

[1] Available at https://www.mass.gov/doc/covid-19-order-66/download.
[2] Available at https://www.mass.gov/info-details/safety-standards-and-checklist-places-of-worship.

- - 50% of the building's maximum permitted occupancy as documented in its occupancy permit on record with the municipal building department or other municipal record holder

  - Buildings for which no permitted occupancy limitation is on record may allow 10 persons per 1,000 square feet of accessible space

  - In any case, no enclosed space (e.g. a single room, basement) within the building may exceed occupancy of 10 persons per 1,000 square feet

  - All occupant counts and calculations shall include attendees but may exclude staff, and other workers

- If feasible, places of worship are encouraged to arrange online sign-up for services in advance in order to monitor and limit the number of attendees

24. In contrast to the dual percentage and square-footage restrictions on capacity imposed on places of worship, the DLS Standards impose no capacity limitations on restaurants[3] or many workplaces.[4]

25. The difference between places of worship and restaurants is particularly striking. Restaurants may serve food, and patrons may take off their masks during meals and need not sit with members of the same household. Places of worship may not serve food in connection with services (though sacramental communion is permitted), worshippers must wear a mask while participating in services, and worshippers are categorically prohibited from sitting with worshippers who are not part of the same household. Despite these differences, restaurants have no special capacity restrictions, subject only to a rule that each party is limited to a 90-minute meal and each table to six diners.

---

[3] Available at https://www.mass.gov/info-details/safety-standards-and-checklist-restaurants.

[4] Available at https://www.mass.gov/info-details/reopening-mandatory-safety-standards-for-workplaces. The general workplace standards superseded more particularized standards for certain workplaces. The general standards contain no capacity limits, although some sector specific standards still do (*e.g.*, office spaces). Under both the old more particularized standards and the new general standards manufacturing and laboratories have no capacity limits. *See* https://www.mass.gov/info-details/safety-standards-and-checklist-manufacturing; https://www.mass.gov/info-details/safety-standards-and-checklist-laboratories.

26. Other sectors have the same 50% capacity restriction as places of worship *but no* square-footage restriction. For example, enclosed shopping mall common areas face a less onerous capacity restriction of 50% of maximum permitted occupancy.[5] Cinemas and theaters with occupancy permits on record have the same 50% cap and additional absolute caps at 250 and 500 persons.[6] According to the regulations:

- Indoor movie theaters must monitor customer entries and exits and limit occupancy at all times to:

    o 50% of each individual theater or screening room's maximum permitted occupancy as documented in its occupancy permit on record with the municipal building department or other municipal record holder and never more than 250 persons in a single enclosed, indoor space

    o Venues for which no permitted occupancy limitation is on record may allow up to 10 persons per 1,000 square feet of accessible space, and never more than 250 persons in a single enclosed, indoor space

- Indoor and Outdoor Theaters and Performance venues must monitor customer entries and exits and limit occupancy at all times to:

    o 50% of the venue's maximum permitted occupancy as documented in its occupancy permit on record with the municipal building department or other municipal record holder, but in no event shall the venue admit or host more than 500 persons

    o Venues for which no permitted occupancy limitation is on record may allow up to 10 persons per 1,000 square feet of accessible space, and never more than 500 persons

27. Cinemas and theaters may also continue to serve food and drink, and customers may remove their masks while eating and drinking. Unlike restaurants, there is no time limit.

28. In addition, under the DLS Standards, office spaces receive capacity restrictions similar to those that apply to places of worship, but unlike places of worship, they may be entitled

---

[5] Available at https://www.mass.gov/info-details/safety-standards-and-checklist-retail-businesses.

[6] Available at https://www.mass.gov/info-details/safety-standards-and-checklist-theaters-and-performance-venues.

to an exemption, based on "public health or public safety considerations or where strict compliance may interfere with the continued delivery of critical services."[7]

29. Moreover, on information and belief, the DLS Standards—as written by the Commonwealth and as implemented by the City—impose no capacity limitation on public transportation, and unlike places of worship, public transportation is free to choose whether and how to limit the capacity of its facilities and public-transport vehicles. The Massachusetts Bay Transportation Authority website advisory on COVID-19 mitigation measures does not state that it is abiding by, or required to abide by, any capacity limitations; instead, it "recommends traveling outside peak travel times whenever possible," and invites riders to "view real-time crowding" information for many MBTA bus routes, as well as "[r]ecent crowding trends on the Red, Orange, and Blue Lines."[8]

### *Communal Gathering Prohibition*

30. In addition to discriminatory capacity restrictions, the DLS Standards also impose a unique restriction on places of worship: "Places of worship shall not have communal gathering pre or post service (e.g., coffee hours or other food services)."

31. This restriction on communal gatherings applies to no other sector under the DLS Standards. Instead, the DLS Standards specifically contemplate that gatherings will continue to occur in the Commonwealth.[9] In particular, the DLS Standards permit "indoor event[s]" at an "event venue (e.g., hotels, private clubs, and space available for lease)," so long as such events are

---

[7] Available at https://www.mass.gov/info-details/safety-standards-and-checklist-office-spaces.
[8] Available at https://www.mbta.com/projects/crowding-information-riders.
[9] Available at https://www.mass.gov/info-details/safety-standards-and-checklist-indoor-and-outdoor-events.

limited to 100 persons.[10]  The DLS Standards expressly state that such events may take place at restaurants and theaters.

32.     Not only does the communal gathering restriction discriminate against places of worship, it purports to regulate the religious conduct that may occur at a place of worship.  The restriction purports to regulate *how* Massachusetts citizens may exercise their religion by forbidding certain religious conduct, including religious conduct central to many religious traditions, and central to New Life's religious exercise.

33.     On April 27, 2021, the Commonwealth announced that it was proceeding to Phase IV Step 2 for certain of its COVID-19 reopening protocols, effective May 10, 2021.[11]  Although the Commonwealth further loosened certain restrictions, including those at certain large venues like "ball parks" and "amusement parks," it did not alter its restrictions on places of worship.

### III.    Application of the Discriminatory and Unlawful Regulations Harms New Life

34.     The City of New Bedford Health Department has notified New Life that it interprets the DLS Standards to impose on each space of the Church's building a capacity restriction of 10 persons per each 1,000 square feet.  In other words, it has notified New Life that it does not consider any space of the Church's building—even the sanctuary—to be subject to the otherwise-applicable (and, for New Life, more generous) capacity restriction of 50% of the occupancy on record.

35.     In particular, the City of New Bedford Health Department has notified New Life that it interprets the DLS Standards to impose the following capacity restrictions on the following rooms of the church building:

---

[10] *Id.*

[11] Available at https://www.mass.gov/news/baker-polito-administration-announces-plans-for-continued-reopening.

| Room | Dimensions | Square footage | Occupancy Limit |
|---|---|---|---|
| Sanctuary | 90 X 100 | 9000 | 90 |
| Green Room | 24 X 10 | 240 | 2.40 |
| Small Conference | 15 X 15 | 225 | 2.25 |
| Media Studio | 11 X 14 | 154 | 1.54 |
| 4th and 5th grade | 28 X15 | 420 | 4.20 |
| Recreation Room | 52 X 30 | 1560 | 15.60 |
| Cafeteria | 64 X 60 | 3840 | 38.40 |
| Lobby | 120 X 75 | 9000 | 90 |
| Nursery | 35 X 24 | 840 | 8.4 |
| Total | | 25,279 | 253 |

36. Under normal circumstances, the church building has the capacity to hold 680 people. Thus, the City and its officials have interpreted the DLS Standards effectively to impose on New Life a capacity restriction of 37.2% of its normal permitted occupancy.

37. On March 26, 2021, through counsel, New Life sent a letter to New Bedford Mayor Mitchell notifying him of the disparate treatment that these limitations place on the Church and asking him to relax them, but the Church received no response.

38. On April 29, 2021, after the Supreme Court's decision in *Tandon v. Newsom*, New Life sent another letter by counsel to officials of both the Commonwealth and the City, explaining how the Commonwealth's regulations violate the First Amendment, but the Church received no response.

39. Due to the DLS Standards, and the City of New Bedford's enforcement of those standards, New Life must limit attendance at its services to a smaller number of attendees than would otherwise attend, burdening the Church's exercise of religion. In particular, New Life sincerely believes it must reach out to and accommodate as many people as possible so that they might find new life in the Lord. But many who otherwise would worship and fellowship in person at the Church have remained home, including on Easter Sunday.

40. Due to the DLS Standards, and the City of New Bedford's enforcement of those standards, leaders and congregants of New Life have been forced to attend separate services when they otherwise could meet together, burdening the Church's free exercise of religion.

41. Due to the DLS standards, and the City of New Bedford's enforcement of those standards, New Life has been prohibited from gathering for Christian fellowship and coffee after services. Post-service fellowship gatherings are an important part of the Church's overall worship experience and exercise of religion. New Life believes that worship of God happens best in communities, and that strong communities depend on both formal and informal gatherings. Post-service fellowship and coffee times also facilitate meetings with, counsel for, and a deeper sense of community between visitors, members, and the Church leadership. Due to the prohibition on pre- and post-service gatherings, the Church has been prevented from engaging in this important aspect of its free exercise of religion.

42. In sum, the capacity restrictions and communal gathering prohibition are more onerous for New Life than those that would apply if it were a restaurant, particular workplace, public transportation entity, shopping mall, theater, performance venue, or office space. The restrictions unlawfully burden the Church's free exercise of religion as well as the Church's right to freedom of speech and freedom of assembly.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 - Violation of Free Exercise Clause

**(Against All Defendants)**

43. New Life incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

44. 42 U.S.C. § 1983 provides a federal cause of action for violations of constitutional rights when such violations occurred under the color of state law.

45. The First Amendment to the United States Constitution protects the "free exercise" of religion, and this protection is applicable to the Commonwealth and its political subdivisions through the Fourteenth Amendment to the United States Constitution.

46. Fundamental to the guarantee of free exercise of religion is the ability to gather and worship. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts . . . [such as the] freedom of worship and assembly.").

47. Even a pandemic does not excuse government from its obligation to respect the free exercise of religion, and COVID-19 mitigation policies that impose uniquely heavy burdens on places of worship—in other words, that are not neutral and generally applicable—are subject to strict scrutiny "whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021).

48. To withstand strict scrutiny, the government must demonstrate that the law furthers "interests of the highest order" and is "narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546 (1993). In the context of the COVID-19 pandemic, "[w]here the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied. Otherwise, precautions that suffice for other activities suffice for religious exercise too." *Tandon*, 141 S. Ct. at 1297.

49. Defendants prohibit, under penalty of law, in-person religious services unless they abide by the capacity restrictions set forth above, and have thus substantially burdened New Life's religious exercise.

50. Defendants' restrictions treat many secular activities more favorably than religious exercise at places of worship. For example, as more fully set forth above, restaurants operate with no capacity restrictions, while cinemas and theaters may operate at 50% capacity. On the other hand, under the City's interpretation of the restrictions, places of worship like New Life are limited to 10 people per 1,000 square feet, resulting in an effective cap for New Life of 37.2% of its normal permitted occupancy. Not only do these unfair and unequal differences trigger strict scrutiny, they also show that Defendants' restrictions neither serve a compelling government interest nor are narrowly tailored. Defendants have determined that it is safe to gather in restaurants (without masks), cinemas, theaters, and other institutions subject only to social-distancing and (partial) face-covering requirements, with fewer or no capacity restrictions. Those same safeguards—which New Life has carefully implemented—suffice for religious exercise. Defendants' capacity restrictions therefore unfairly target religious exercise and impose an unconstitutional burden on religious practice.

51. In addition to the discriminatory capacity restrictions, the DLS Standards also limit "communal gatherings" before and after worship services. This restriction also is discriminatory because there is no such "gathering" prohibition on *any other sector*. But the restriction also violates the Constitution because it purports to dictate *how* Massachusetts citizens may exercise their religion. This is no different in principle from prohibiting "animal sacrifice," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 524 (1993), or "bowing down before a golden calf," *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 878 (1990).

52. New Life has suffered irreparable harm, including the loss of fundamental constitutional rights, entitling it to injunctive relief, declaratory relief, legal relief, and attorneys' fees and costs.  28 U.S.C. § 2201; 28 U.S.C. § 1343(a); 42 U.S.C. § 1988.

## SECOND CAUSE OF ACTION

**42 U.S.C. § 1983 – Violation of the Free Speech Clause of the First Amendment**

**(Against All Defendants)**

53. New Life incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

54. 42 U.S.C. § 1983 provides a federal cause of action for violations of constitutional rights when such violations occurred under the color of state law.

55. The First Amendment to the United States Constitution provides constitutional protection for private speech, including religious speech, and this protection is applicable to the Commonwealth and its political subdivisions through the Fourteenth Amendment to the United States Constitution.

56. Under the Free Speech Clause, "a government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'"  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chicago v. Mosley*, 408 U. S. 92, 95 (1972)).

57. A content-based restriction is a law that "target[s] speech based on its communicative content," such as "the topic discussed or the idea or message expressed."  *Id.*

58. "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas

contained' in the regulated speech." *Id.* at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U. S. 410, 429 (1993)).

59. Restrictions on religious gatherings are content-based restrictions. *See, e.g., Good News Club v. Milford Central School*, 533 U.S. 98 (2001) (recognizing that forum restriction on an organization that taught Bible verses to children via stories, games, and prayer was a restriction on the freedom of speech).

60. Governments may not place content-based restrictions on speech, whether facially or as-applied, unless the government restriction can withstand strict scrutiny. *Id.* at 159. For the reasons set forth above, Defendants cannot satisfy that standard.

61. New Life has suffered irreparable harm, including the loss of fundamental constitutional rights, entitling it to injunctive relief, declaratory relief, legal relief, and attorneys' fees and costs. 28 U.S.C. § 2201; 28 U.S.C. § 1343(a); 42 U.S.C. § 1988.

## THIRD CAUSE OF ACTION

**42 U.S.C. § 1983 – Violation of the Assembly Clause of the First Amendment**

**(Against All Defendants)**

62. Plaintiff incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

63. 42 U.S.C. § 1983 provides a federal cause of action for violations of constitutional rights when such violations occurred under the color of state law.

64. The First Amendment to the United States Constitution provides constitutional protection for assembly, including religious assembly, and this protection is applicable to the States and their political subdivisions through the Fourteenth Amendment to the United States Constitution.

65. The Supreme Court has long recognized that the First Amendment's freedom of assembly includes religious assemblies. *See NAACP v. Alabama*, 357 U.S. 449, 460-62 (1958). "Joining a lawful organization, like attending a church, is an associational activity that comes within the purview of the First Amendment . . . . 'Peaceably to assemble' as used in the First Amendment necessarily involves a coming together, whether regularly or spasmodically." *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 562 (1963) (Douglas, J., concurring) (noting that while, historically, the right to assemble was considered part of the right to petition the government for a redress of grievances, the right to assemble has since become "equally fundamental" with the right to free speech and thus applies to "attending a church").

66. "The right of free speech, the right to teach, and the right of assembly are, of course, fundamental rights." *Whitney v. California*, 274 U.S. 357, 373 (1927). When a government practice restricts fundamental rights, it is subject to "strict scrutiny" and can be justified only if it furthers a compelling government purpose and, even then, only if no less restrictive alternative is available. *See, e.g., San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16–17 (1973); *Dunn v. Blumstein*, 405 U.S. 330 (1972).

67. By denying New Life the ability to assemble via an in-person church service in numbers greater than the uniquely burdensome capacity restrictions that they have imposed, and by restricting New Life's traditional post-service communal gathering, Defendants violate the Freedom of Assembly Clause. Defendants cannot meet the no-less-restrictive-alternative test. Imposing more restrictive requirements that target only places of worship, their services, and their gatherings is not the least restrictive means of achieving Defendants' public safety goal, as the less restrictive alternatives that Defendants have imposed on non-religious activities and entities plainly show.

68. Requiring New Life to either abstain from its religious gatherings or conduct them under more burdensome requirements than those that apply to other entities and to businesses violates New Life's constitutional right peaceably to assemble.

69. New Life has suffered irreparable harm, including the loss of fundamental constitutional rights, entitling it to injunctive relief, declaratory relief, legal relief, and attorneys' fees and costs.  28 U.S.C. § 2201; 28 U.S.C. § 1343(a); 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

70. New Life requests that the Court enter an order:

> Declaring that Defendants have unlawfully burdened Plaintiff's constitutional rights;
>
> Temporarily restraining, preliminarily enjoining, and permanently enjoining Defendants from enforcing the place of worship capacity limitations and the communal gathering prohibition of the DLS Standards;
>
> Awarding damages to be established at trial;
>
> Awarding attorneys' fees and costs;
>
> Awarding such other and further relief as the Court deems just.

## DEMAND FOR JURY TRIAL

71. New Life demands a jury trial on all issues.

Dated: May 10, 2021.

Christopher DiPompeo*
Brett J. Wierenga*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-3939
cdipompeo@jonesday.com
bwierenga@jonesday.com

Kurt A. Johnson*
JONES DAY
150 W. Jefferson Ave.
Suite 2100
Detroit, MI 48226
(313) 733-3939
kajohnson@jonesday.com

Kelly C. Holt*
JONES DAY
250 Vesey Street,
New York, New York 10281
Admitted only in Massachusetts
(212) 326-3939
kholt@jonesday.com

*/s/ Andrew Beckwith*
Andrew D. Beckwith (BBO #657747)
MASSACHUSETTS FAMILY INSTITUTE
400 TradeCenter, Suite 1950
Woburn, MA 01801
(781) 569-0400
andrew@mafamily.org

Hiram S. Sasser, III*
Texas Bar No. 24039157
David J. Hacker*
Texas Bar No. 24103323
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Ste. 1600
Plano, Texas 75075
(972) 941-4444
(972) 941-4457 Fax
hsasser@firstliberty.org
dhacker@firstliberty.org

Jordan E. Pratt*
Florida Bar No. 100958**
FIRST LIBERTY INSTITUTE
227 Pennsylvania Avenue S.E.
Washington, DC 20003
(972) 941-4444
(972) 941-4457 Fax
jpratt@firstliberty.org

*Applications for admission *pro hac vice* forthcoming.

** Not yet admitted to the District of Columbia Bar, but admitted to practice law in Florida. Practicing law in the District of Columbia pursuant to D.C. Court of Appeals Rule 49(c)(8) under the supervision of an attorney admitted to the District of Columbia Bar.